The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Plaintiff,

v.

Michael LENNEN, et al., Defendants.

UNION PACIFIC RAILROAD COMPANY, et al., Plaintiffs,

v.

The DEPARTMENT OF REVENUE OF the STATE OF KANSAS, et al., Defendants.

CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, et al., Plaintiffs,

v.

Michael LENNEN, et al., Defendants.

MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, Plaintiff,

v.

Michael LENNEN, et al., Defendants.

BURLINGTON NORTHERN, INC., et al., Plaintiffs,

v.

Philip W. MARTIN, et al., Defendants.

Nos. 80–4172, 80–4173, 80–4176, 80–4181 and 80–1690.

United States District Court, D. Kansas.

July 7, 1981.

Laurence E. Garrett, J. B. Reeves, Topeka, Kan., for plaintiff in 80–4172.

James P. Buchele, U. S. Atty., Topeka, Kan., for plaintiffs in 80–4172, 80–4173 and 80–4181.

Carol B. Bonebrake and John P. Quinlan, Dept. of Revenue, Topeka, Kan., Regan & McGannon, Wichita, Kan., for defendants in all cases.

Chester A. Arterburn, Jr., Sabatini, Waggener, Vincent & Arterburn, Topeka, Kan., for plaintiffs in 80–4173.

Mark L. Bennett, Jr., Davis & Bennett, Topeka, Kan., for plaintiffs in 80–4176 and 80–4181.

Alan F. Alderson, Steven C. Montgomery, Clarence J. Malone, Dept. of Revenue, Topeka, Kan., for defendants in 80–4176.

Robert C. Foulston, Stanley G. Andeel, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for plaintiffs in 80–1690.

Patrick J. Regan, James J. McGannon, Wichita, Kan., for defendants in 80–1690.

Wm. D. Rustin, Co. Counselor, Paul M. Buchanan, Asst. County Counselor, Wichita, Kan., Wendell J. Barker, Ottawa, Kan., Wm. F. Stahl, Junction City, Kan., Robert J. O'Connor, Jeff A. Roth, Wichita, Kan., Bert R. Hopper, Seward County Counselor, Smith, Greenleaf & Brooks, Liberal, Kan., Douglas L. Baker, Pittsburg, Kan., John E. Lang, Pottawatomie County Counselor, Westmoreland, Kan., Robert J. Frederick, Kearny County Atty., Lakin, Kan., Tom R. Smith, Liberal, Kan., Gale & Gale, Robert H. Gale, Jr., Syracuse, Kan., Douglas S. Brunson, Kiowa County Atty., Greensburg, Kan., Grant M. Glenn, Donald J. Horttor, Cosgrove, Webb & Oman, Topeka, Kan., Gordon A. Harness, Comanche County Atty., Coldwater, Kan., Thomas L. Wilson, Woodson County Atty., Yates Center, Kan., B. A. Lightfoot, Hodgeman County Atty., Jetmore, Kan., Hathaway & Kimball, Ulysses, Kan., John L. Weingart, Asst. Brown County Atty., Hiawatha, Kan., Daniel L. Love, Ford County Atty., Dodge City, Kan., Wm. Rex Lorson, Saline County Atty., Salina, Kan., Larry T. Solomon, Kingman, Kan., Mickey Carl Moorman, Meade County Atty., Meade, Kan., for county defendants.

## MEMORANDUM

ROGERS, District Judge.

On June 17, 1981, this court issued an order ruling upon several motions filed in the above-captioned cases. In that order, the court promised that a more detailed memorandum would follow. This memorandum discusses the rulings made by this court in our previous order.

*Background*

A summary of the rather complicated and extended procedural background of this litigation is necessary to fully understand the instant memorandum. On June 30, 1980, the Atchison, Topeka and Santa Fe Railway Company filed a complaint in this court alleging that the State of Kansas was discriminating against rail transportation property in assessing and collecting property taxes in violation of 49 U.S.C. § 11503. Named as defendants in the action were the Department of Revenue of the State of Kansas; Michael Lennen, Secretary of Revenue of the State of Kansas; and Philip W. Martin, Director of Property Valuation of the Department of Revenue of the State of Kansas (hereinafter referred to as the "State defendants"). Jurisdiction was asserted under the provisions of 49 U.S.C. § 11503(c); 28 U.S.C. §§ 1331 and 1337;

Article I, Section 8, Clause 3 (Commerce Clause) and Article VI, Clause 2 (Supremacy Clause) of the Constitution of the United States. Attached to the complaint were several exhibits. These exhibits consisted of the results of sales assessment ratio studies conducted by Dr. Wilfred Pine, a professor at Kansas State University, which purported to show that real property in Kansas is assessed at a lower ratio to fair market value than is rail transportation property.[1] Based upon these exhibits, plaintiff sought to enjoin the defendants and the county treasurers of the 68 counties of the State of Kansas in which their rail property was located from collecting property taxes in excess of what the plaintiff believed it owed for the first half of its 1980 property taxes.

On the same day, the Union Pacific Railroad Company[2] filed a similar complaint in this court. Subsequently, separate similar actions were filed by the Chicago, Rock Island and Pacific Railroad Company and the Missouri-Kansas-Texas Railroad Company. On September 22, 1980, these actions were consolidated by this court for purposes of discovery and trial (hereinafter referred to collectively as the "Topeka railroads").

On September 3, 1980, seven railroads[3] filed a complaint with the clerk of this court in Wichita alleging that the State of Kansas had illegally assessed and collected property taxes from them in 1979 in violation of 49 U.S.C. § 11503 (hereinafter referred to collectively as the "Wichita rail-roads"). Furthermore, the complaint alleged that the State of Kansas was discriminating against rail transportation property in assessing and collecting property taxes in 1980, also in violation of 49 U.S.C. § 11503. The same defendants were named as those named in the lawsuits brought by the Topeka railroads. Jurisdiction was asserted pursuant to 49 U.S.C. § 11503(c). The Wichita railroads sought injunctive relief from their payment of 1980 taxes and sought a refund for their alleged illegal payment of 1979 taxes.[4]

On November 20, 1980, this court held a hearing upon the Topeka railroads' motion for preliminary injunction. The Topeka railroads sought to enjoin the defendants and their agents, including the county treasurers of the 98 counties of the State of Kansas in which their rail transportation property was located, from collecting property taxes in excess of what plaintiffs believe they owed for the first half of their 1980 property taxes. In addition, the railroads moved for an order, pursuant to Rule 67 of the Federal Rules of Civil Procedure, allowing them to deposit the amount of property tax in excess allegedly owed by them with the clerk of this court. On December 3, 1980, this court denied the motion for preliminary injunction. We found that the evidence presented by the plaintiffs had demonstrated a "good chance" of success on the merits but noted that numerous factual issues remained to be examined. The court further found that the plaintiffs had not

1. Dr. Pine conducted two sales assessment ratio studies. One study showed that all locally assessed commercial and industrial real property was assessed at 12.7% of fair or true market value. The study further showed that if state assessed utility property in Kansas was included within the definition of commercial and industrial property, then the ratio figure rose to 20.01% of true market value. The other study showed that all real property in Kansas was assessed at 12.6% of true market value.

2. The St. Joseph and Grand Island Railway Company joined the Union Pacific Railroad Company as a plaintiff in this complaint. Any reference to the Union Pacific in this or any other order of the court includes the St. Joseph and Grand Island Railway Company.

3. These railroads consisted of the following: Burlington Northern, Inc.; Chicago and Northwestern Transportation Company; The Kansas City Southern Railway Company; The Kansas and Missouri Railway and Terminal Company; Kansas City Terminal Railway Company; Missouri Pacific Railroad Company; St. Louis-San Francisco Railway Company. On March 4, 1981, the parties stipulated that the Burlington Northern, Inc., should be substituted as the successor in interest to the St. Louis-San Francisco Railway Company.

4. The complaint alleged that commercial and industrial property in Kansas was assessed at 12.7% of true market value. It further alleged that all property in Kansas was assessed at 8.0% of true market value.

sufficiently shown that they would be subjected to irreparable harm if the injunction was denied because the "speedy and efficient" tax protest and refund procedures available under Kansas law remained usable to the plaintiffs. It was this court's concern over the potential harm that could be caused the local governments of Kansas, if the railroads' taxes were not timely paid, that led the court to conclude that the motion for preliminary injunction should be denied. After a motion for reconsideration was denied, plaintiffs appealed this court's order to the Tenth Circuit Court of Appeals.

On December 11, 1980, the Tenth Circuit granted the Topeka railroads a temporary injunction pending the resolution of the appeal. The court declared:

> It is ordered that Defendants, their successors, their agents or employers, and all in active concert or participation with them, including the county treasurers of 98 counties of the State of Kansas listed on the attachment hereto, are enjoined and restrained until the further order of this court from collecting the first half of Plaintiffs' 1980 property taxes as assessed and levied and due on or before December 20, 1980, pursuant to K.S.A. 79–2004 which amounts are in dispute in this litigation.

This order caused some confusion[5] because of the uncertainty of the phrase "which amounts are in dispute in this litigation". In our order denying the injunction, this court had not specifically arrived at a ratio that seemed correct. The figure, upon which the later calculations of the amounts in dispute were made, had been determined by the railroads and the defendants had not seriously countered the specific amount, due to their legal arguments that the ratio used by Dr. Pine was improper. Nonetheless, the Topeka railroads were allowed to pay 58% of their taxes into the registry of this court and required to pay the remaining portion of their taxes to the counties.

On December 16, 1981, the Wichita railroads' motion for a preliminary injunction came on for hearing before Chief Judge Frank G. Theis in Wichita. At that hearing, the Wichita case was transferred to Topeka for further proceedings before this court. Thereafter, we heard evidence on the Wichita railroads' motion for preliminary injunction and the matter was taken under advisement. On December 17, 1981, this court issued an order granting the Wichita railroads a temporary injunction pending the outcome of the appeal taken by the Topeka railroads. This court found that the evidence presented by the Wichita railroads on the merits was "far stronger than that the court relied upon in its earlier decision regarding the Topeka railroads," but continued to find that plaintiffs had not made a sufficient showing of irreparable harm. However, in the interest of judicial economy, the court decided to grant the plaintiffs a temporary injunction and await a decision by the Tenth Circuit on the appeal taken by the Topeka railroads. The court restrained the defendants and their agents from collecting any portion of the Wichita railroads' 1980 first half taxes. The court found that all of the Wichita railroads' first half 1980 taxes were in dispute because of their claims for an offset or refund of their overpayment of 1979 taxes.

On January 26, 1981, the Tenth Circuit reversed this court's order of December 3, 1980, and held that an injunction should have been entered. *Atchison, Topeka & Santa Fe Railway Co. v. Lennen*, 640 F.2d 255 (10th Cir. 1981) (*per curiam*). The Tenth Circuit found that this court had improperly applied private interest injunction standards rather than the appropriate public interest standards. The court stated:

> When the trial court weighed the damage to be suffered by the Railroads against the damage to be suffered by the State treasury, it did not exercise its discretion to grant or deny the injunction in light of the purpose of the Interstate

---

5. Following the issuance of this order, the Kansas Department of Revenue issued a memorandum to all the county treasurers that clarified the amount in dispute. On December 19, 1980,

B. A. Lightfoot, County Attorney for Hodgeman County, Kansas, wrote the Tenth Circuit and registered his complaint on the lack of guidance provided in the order.

Commerce Act. Because of this the trial court abused its discretion in denying the injunction.

640 F.2d at 259.

The Court concluded that it was unnecessary for the railroads to demonstrate that they would suffer irreparable harm if the injunction was denied.[6] In accordance with the directives of the Tenth Circuit, this court entered preliminary injunctions in both the Topeka and Wichita railroads' cases. The court essentially continued the earlier orders that had been entered allowing temporary injunctions.

On February 3, 1981, the Topeka railroads sought to amend their complaint to add a second cause of action seeking a refund of their 1979 taxes which they alleged were illegally assessed and collected from them in violation of Section 306. On February 25, 1981, this motion was granted.

On March 2, 1981, both groups of railroads sought to amend their respective complaints to include an additional cause of action and to join additional defendants. The new cause of action requested relief from the various counties in Kansas for illegally collecting 1979 property taxes in violation of 42 U.S.C. § 1983. The additional party defendants consisted of the various county clerks and treasurers of the State of Kansas (hereinafter referred to as the "county defendants"). These defendants were named only in the railroads' causes of action for their 1979 taxes. No opposition was made to this motion and the court subsequently granted it. On March 4, 1981, all of the aforementioned cases were consolidated for further proceedings.

Thereafter, various motions were filed by all parties. This matter is presently before the court upon the following three motions: (1) plaintiffs' motion to amend their complaints; (2) plaintiffs' motion to continue preliminary injunction; and (3) defendants' motion to dismiss.

*Legislative Background*

For many years, railroads have contended that they were being subjected to gross discrimination by the states in the area of ad valorem taxation. In 1961, the Report of the Senate Committee on Interstate and Foreign Commerce on National Transportation Policy, S.Rep.No.445, 87th Cong., 1st Sess. (hereinafter referred to as the "Doyle Report"), confirmed that state and local assessment procedures in many states did, in fact, discriminate against railroads. After the publication of the Doyle Report, Congress began to seriously consider providing some sort of relief in the area of property taxation for the railroads. The final result of the labors of Congress was the passage of the Railroad Revitalization and Regulatory Reform Act of 1976. Section 306 of the 4–R Act specifically prohibited discrimination against rail transportation property in the levy and collection of state and local property taxes. Section 306 provided as follows:

(1) Notwithstanding the provisions of section 202(b), any action described in this subsection is declared to constitute an unreasonable and unjust discrimination against, and an undue burden on, interstate commerce. It is unlawful for a State, a political subdivision of a State, or a governmental entity or person acting on behalf of such State or subdivision to commit any of the following prohibited acts:

---

6. At the hearing on the instant motions, counsel for the state defendants called the ruling of the Tenth Circuit "egregious." While this court does not believe that such harsh criticism is justified, it would note the following legislative history of Section 306 that the Court of Appeals apparently found irrelevant:

Enactment of this section will not necessarily mean that the Federal courts will enjoin all state taxation of rail property which are the subject of complaint. The railroads will still have the burden of demonstrating that discrimination exists. They will also have to make the additional showing that they are entitled to injunctive relief. *With respect to the latter issue, the courts in the exercise of equity jurisdiction will balance the adverse impact on the community of granting such relief against the benefits to the carrier from such relief.* The Federal courts will be able to devise remedies that will not be burdensome to the communities involved. (emphasis added). H.Rep. 94–725, 94th Cong., 1st Sess. (1975).

(a) The assessment (but only to the extent of any portion based on excessive values as hereinafter described), for purposes of a property tax levied by any taxing district, of transportation property at a value which bears a higher ratio to the true market value of such transportation property than the ratio which the assessed value of all other commercial and industrial property in the same assessment jurisdiction bears to the true market value of all such other commercial and industrial property.

(b) The levy or collection of any tax on an assessment which is unlawful under subdivision (a).

(c) The levy or collection of any ad valorem property tax on transportation property at a tax rate higher than the tax rate generally applicable to commercial and industrial property in the same assessment jurisdiction.

(d) The imposition of any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part.

(2) Notwithstanding any provision of section 1341 of title 28, United States Code, or of the constitution or laws of any State, the district courts of the United States shall have jurisdiction, without regard to amount in controversy or citizenship of the parties, to grant such mandatory or prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate any acts in violation of this section, except that—

(a) such jurisdiction shall not be exclusive of the jurisdiction which any Federal or State court may have in the absence of this subsection;

(b) the provisions of this section shall not become effective until 3 years after the date of enactment of this section;

(c) no relief may be granted under this section unless the ratio of assessed value to true market value, with respect to transportation property, exceeds by at least 5 per centum the ratio of assessed value to true market value, with respect to all other commercial and industrial property in the same assessment jurisdiction;

(d) the burden of proof with respect to the determination of assessed value and true market value shall be that declared by the applicable State law; and

(e) in the event that the ratio of the assessed value of all other commercial and industrial property in the assessment jurisdiction to the true market value of all such other commercial and industrial property cannot be established through the random-sampling method known as a sales assessment ratio study (conducted in accordance with statistical principles applicable to such studies) to the satisfaction of the court hearing the complaint that transportation property has been or is being assessed or taxed in contravention of the provisions of this section, then the court shall hold unlawful an assessment of such transportation property at a value which bears a higher ratio to the true market value of such transportation property than the assessed value of all other property in the assessment jurisdiction in which is included such taxing district and subject to a property tax levy bears to the true market value of all such other property, and the collection of any ad valorem property tax on such transportation property at a tax rate higher than the tax rate generally applicable to taxable property in the taxing district.

(3) As used in this section, the term—

(a) "assessment" means valuation for purposes of a property tax levied by any taxing district;

(b) "assessment jurisdiction" means a geographical area, such as a State or a county, city, township, or special purpose district within such State which is a unit for purposes of determining the assessed value of property for ad valorem taxation;

(c) "commercial and industrial property" or "all other commercial and industrial property" means all property, real or personal, other than transportation property and land used primarily for agricultural purposes or primarily for the purpose of growing timber, which is devoted to a commercial or industrial use and which is subject to a property tax levy; and

(d) "transportation property" means transportation property, as defined in regulations of the Commission, which is owned or used by a common carrier by railroad subject to this part or which is owned by the National Railroad Passenger Corporation.

The effective date of Section 306 was postponed until February 5, 1979. The purpose of the delayed effective date was to allow the states sufficient time to correct the unreasonable burden and discriminatory practices against railroads which had long burdened interstate commerce. *See* S.Rep. 91–630, 91st Cong., 1st Sess. (1969).

Section 306 was originally codified at 49 U.S.C. § 26c (1976). In 1978, § 26c was repealed and revised becoming 49 U.S.C. § 11503. The Revised Interstate Commerce Act of 1978, 49 U.S.C. § 10101 *et seq.*, recodified Subtitle IV of Title 49 of the United States Code. Section 11503 of that Act recodified § 306 of the 4–R Act. 49 U.S.C. § 11503 provides as follows:

(a) In this section—

(1) "assessment" means valuation for a property tax levied by a taxing district.

(2) "assessment jurisdiction" means a geographical area in a State used in determining the assessed value of property for ad valorem taxation.

(3) "rail transportation property" means property, as defined by the Interstate Commerce Commission, owned or used by a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

(4) "commercial and industrial property" means property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy.

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

(c) Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed

by State law. If the ratio of the assessed value of other commercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section—

    (1) an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction has to the true market value of all other commercial and industrial property; and

    (2) the collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district.

It is under the aforementioned statute that the railroads in the instant action seek relief.

*Discussion*

In our past orders in this action, this court has attempted to interpret various portions of § 306 of the 4–R Act. This has caused the court some difficulty due to the revisions that were made when § 306 was recodified at 49 U.S.C. § 11503.[7] Furthermore, the relative dearth of decisions under § 306[8] has required this court to explore

issues where little guidance is present. This memorandum will attempt to further discuss and resolve some of the issues raised by the parties in this case.

One such issue is the question of what the appropriate "assessment jurisdiction" is in this lawsuit. Section 306 contains the following definition of "assessment jurisdiction": "a geographical area, such as a State or a county, city, township, or special purpose district within such State which is a unit for purposes of determining the assessed value of property for ad valorem taxation." 49 U.S.C. § 11503 defines "assessment jurisdiction" as follows: "a geographical area in a State used in determining the assessed value of property for ad valorem taxation." The Historical and Revision Notes to § 11503 state that "[t]he words 'such as a State or a county, city, township, or special purpose district ... which is a unit' are omitted as unnecessary in view of the restatement." It is plaintiffs' contention that the "state" is the appropriate assessment jurisdiction in the instant case. The defendants, however, assert that the "county" is the proper assessment jurisdiction.

In order to understand the position of each party, it is first necessary to examine the assessment procedures used in the State of Kansas for ad valorem tax purposes. In Kansas, railroad property is valued pursuant to the unitary approach. See K.S.A. § 79–5a04. Under this approach, a railroad is valued as a "going concern." The Director of Property Valuation is required to determine the unit valuation allocated to

---

**7.** In *Atchison, Topeka & Santa Fe Railway Co. v. Lennen, supra* at 258, the Tenth Circuit provided this court with some guidance on this problem. The court stated:

    The legislative purpose of the Revised Interstate Commerce Act was to "restate, without substantive change, laws enacted before May 16, 1978, that were replaced by these sections. These sections may not be construed as making a substantive change in the laws replaced." 49 U.S.C.A. at p. 1. This legislative purpose is strongly enunciated in the legislative history of the Act. House Report No. 95–1395, 1978 U.S.Code Congressional and Administrative News, pps. 3009 *et seq.*, specifically pps. 3013, 3016, 3019; 124

Congressional Record No. 151, Senate Hearings Sept. 25, 1978, pp. 16059–60 (Senator Paul Hatfield stated as follows: "Thus by enacting [this law] we are not making any new law; we are merely making existing law more understandable." For this reason, no Senate Report was filed). Therefore, any substantive conflicts between § 306 of the 4–R Act and 49 U.S.C. § 11503 must be resolved in favor of the meaning of § 306 of the 4–R Act.

**8.** This court is aware of litigation involving § 306 in the states of Arizona, Montana, North Dakota, Tennessee, Alabama and Arkansas.

Kansas by examining the following factors: (1) original cost; (2) original cost less depreciation; (3) market value of all outstanding capital stock and debt; (4) utility operating income; and (5) any other available information or evidence. After a weighing process involving these factors, the Director arrives at a figure which is value of the railroad allocated to Kansas. This value is then distributed among the counties where rail transportation property is located. Thus, the value of the railroad is determined by an examination of it as an entire system rather than by a determination of the summary of each piece of property within the State. The entire valuation procedure is performed at the State level and the counties are not involved in any part of this process.

Valuation of other property in Kansas, excluding utilities, is performed at the local level, under the guidance of the Director of Property Valuation. See K.S.A. § 79–1404. The State provides the local county assessors with a multitude of manuals to aid them in the valuation of personal property. Philip Martin, Director of Property Valuation, testified that over 90% of all personal property in Kansas is assessed through the use of the guides provided by the State. He stated that the local assessors were required to follow the guides as long as they provided fair market value for the particular item of personal property. If the guide did not provide fair market value on the given piece of property, the local assessor is allowed to deviate from the guide in order to achieve the proper value. The valuation of real property, on the other hand, is performed by the local assessor without the use of any guides. The State, however, does provide each county assessor with a copy of the State's "Sales Assessment Ratio Study", wherein it is stated:

> The primary purpose of the Kansas Real Estate Assessment/Sales Ratio Study is to provide useful information to property tax administrators. For the appraiser, such information can be used as a check on the equality and uniformity of assessments within his assessment jurisdiction.

Based upon the aforementioned discussion of the property tax assessment procedures in Kansas, each party has taken a different view on the appropriate "assessment jurisdiction" in this litigation. A decision on this issue could have a substantial impact on the outcome of this action. It is apparent from the legislative history of Section 306 that Congress recognized the importance of the definition of assessment jurisdiction. Congress amended the first version of Section 306 in order to use the term "assessment jurisdiction" rather than the term "taxing district." The reason for this change was explained in S.Rep.No.91–630, 91st Cong., 1st Sess. (1969):

> The second amendment is a substitution of the term "assessment jurisdiction" for the term "taxing district" where the latter term appeared in lines 14–15 of page 2 of S. 2289 (Star Print). The determination of assessed value of property other than that of carriers is often made by a single authority, such as a county assessor, and used by several taxing districts, such as the county, school districts and other taxing districts in the county. The amendment makes it plain that the pertinent assessed value is that determined by the usual assessing authority for use by the taxing district under consideration.
>
> In most States the property of carriers is assessed by a State agency, while property of others is assessed by a local agency. As a result, any given piece of property may be located in two "assessment jurisdictions," that is, the State and the locality. This fact raises the question of which "assessment jurisdiction" shall be used for purposes of comparing assessed value of carrier property with that of all other property. *The committee believes that the resolution of that question is a function properly to be performed by a court upon considerations presented to it in the case before it.*

Consequently, the definition of "assessment jurisdiction" is broad enough to permit the contest of an assessment either by comparing the aggregate of assessments of all other property on a state-

wide basis with the carrier property allegedly overassessed or by comparison of the assessment of the carrier property within a more limited area such as a county, city or township with the aggregate of assessments of all other property in the more limited geographical area. The committee recognizes that it is sometimes more equitable and more productive of a fair result for the carrier assessment to be compared and equalized with a statewide ratio than with a ratio within a more limited geographical area, and that in other instances the converse may be true. The definition of "assessment jurisdiction" is set forth in the new paragraph (2) of the proposed section 25a of the Interstate Commerce Act.[9] (emphasis added.)

9. This language was later discussed in the House of Representatives in a hearing before the Subcommittee on Transportation and Aeronautics, wherein the following was said:

MR. PICKLE [Representative from Texas]: "In most States the property is assessed by State agencies while property of others is assessed by local agency"—as in my case in Texas. "As a result, any given piece of property may be located in two assessment jurisdictions." That is State and locally. The fact raises the question of which assessment jurisdiction shall be used for the purpose of comparing assessed value of carrier property with that of other property.

"The committee believes that the resolution of that question is a function properly to be performed by courts upon consideration presented to it in the case before it."

Then it goes on to talk in terms of assessment jurisdiction. I assume what the Senate was attempting to say was that when they talk about assessment jurisdiction, they had hoped that the language listed on page 2, line 22, in terms of definition of "transportation property, assessment jurisdiction" and "all other property" would be a means of determining this problem.

Now, does this answer the problem or is there still a question? Do I have a problem in my own State about taxation locally?

MR. LANIER. [Vice President, Louisville & Nashville Railroad Company]: No, sir; you do not. The problem this language refers to would be one in which railroads were—unlike in Texas—assessed by the State Department of Revenue, whereas your individually owned property was assessed by your local assessor.

Now, let us assume that throughout the State the average of all of the equalization ratios are prevailing in the State. Take Mr.

It appears clear to the court that Congress intended for the courts to make the ultimate decision of what the appropriate assessment jurisdiction will be in a given case. Thus, the issue in the instant action is whether the use of a statewide ratio or a county by county ratio is "more equitable and more productive of a fair result" under the circumstances of our case. Since neither side has extensively briefed or argued this issue, the court shall require the parties to submit briefs in support of their respective positions. However, for the purposes of the pending motion for preliminary injunction, the court shall use the statewide ratios. At this point in the litigation, it is the court's belief that a broader viewpoint is required. In addition, this court notes

Adams' example of differing ratios from county to county. Let us assume that average was 50 percent whereas the equalization ratio in one county was 25 percent.

*Each one of those, the county and the State, is an assessment jurisdiction because the county assesses local property and the State assesses railroad property. This is intended to say that which of those ratios is used, the statewide average or the county ratio only, is a matter that the Senate committee at least felt could not and should not be resolved in the bill. In fact, you get into it in litigation and even conversational negotiations with the administration, whether to use a county-by-county ratio or to use a statewide ratio.*

And there are arguments that are in favor and against either one.

MR. PICKLE. But under the Senate measure in most instances if litigation came about, the suit would be against a State for the assessment of whatever value they might put on it?

MR. LANIER. That is correct.

MR. PICKLE: But in my particular case if litigation was brought about, it would be a suit by the railroad company against X county or city. So in a lot of States it would just be a State action. In my case it might be hundreds of different places where these suits could be brought.

MR. LANIER. But the only assessment jurisdiction in your case would be the county. There would not be any problem about any conflict because you only have the one assessment jurisdiction relative to that particular property.

that in *Ogilvie v. State Board of Equalization of the State of North Dakota*, 492 F.Supp. 446 (D.N.D.1980), the court, under circumstances similar to the instant case, examined statewide ratios rather than local ratios. In order to determine this issue before the time of trial, both sides should submit briefs on this issue within twenty days. At that time, the court shall decide whether oral argument is necessary and thereafter rule on this issue.

Another issue which has arisen during this litigation is the question of how the assessment ratio of rail transportation property should be compared with other property. It is the defendants' contention that the property of the railroads should be divided into real and personal property and the ratios of each type of property be compared with the assessment ratios of like commercial and industrial property. It is the plaintiffs' position that due to the unitary assessment of railroad property, it cannot and should not be broken down into real and personal property. This court has touched upon this argument in our order of December 3, 1980. In that order, we stated:

The defendants point out that, under the laws of Kansas, most of the property owned by railroads is considered "personal property." This fact is graphically demonstrated in the following chart prepared by Michael W. Goodwin, Chief of the Public Service Company Bureau of the Division of Property Valuation, Kansas Department of Revenue:

| Railroad | Assessed Value Real Estate Not On Right-of-Way | Total Assessed Value |
|---|---|---|
| AT&SF | 483,745 | 57,307,500 |
| MKT | 2,170 | 4,803,000 |
| UP | 0 | 37,585,163 |
| CRI&P | 16,200 | 9,582,000 |

Thus, under Kansas law, all of these railroads own less than one per cent of real property.

The defendants assert that the law in Kansas has long been settled that railroad property situated on the railway right-of-way is classified as personal property for purposes of taxation by the State of Kansas. *See Railway Co. v. Miami County*, 67 Kan. 434, 73 P. 103 (1903). They believe this designation has long been to the advantage of the railroads and that this classification should not be upset by the court. It is defendants' contention that the legislative history of 49 U.S.C. § 11503 clearly indicates that Congress did not intend to abolish a state's right to distinguish between real property and personal property for taxation purposes. In Senate Report No. 91–630, 91st Congress, 1st Session (1969), the Senate Committee on Commerce stated:

"*Subparagraph (c) of S.2289 is not intended to abrogate the right of a State to establish separate rates for the different traditional classes of property.* That is, the language of subparagraph (c) is not intended to interfere with the classification of property by a State for rate purposes into the tradional breakdown of real property, tangible personal property, and intangible property, *provided that carrier transportation real property is taxed at no higher rate than other real property; that carrier transportation personal property is taxed at no higher rate than other personal property* ; and that carrier transportation intangibles are taxed at no higher rate than other intangible property. For example, S.2289 would not affect a State tax of real property at 50 cents per $100 of assessed value and tangible personal property at $1 per $100 of assessed value. However, if the State sought to levy a $1 tax rate against carrier real property when the rate applied to real property of others was only 50 cents per $100 of assessed value, the higher rate would be proscribed under the terms of subparagraph (c), and the other rate would be applicable." [Emphasis added.]

In *Ogilvie v. State Board of Equalization, supra*, the court quoted almost identical language from an earlier Senate report that was concerned with the passage of Section 306. In that case, the court

held, pursuant to Section 306(1)(d) [now 49 U.S.C. § 11503(b)(4)], that the portion of railroad property of each plaintiff attributable to personal property should be entirely exempt from taxation by North Dakota since the personal property of locally assessed commercial and industrial companies was not taxed by the state. The court noted that "the emphasis of Congress was on discrimination among all forms of property, not just among carriers or public utilities." 492 F.Supp. at 455. The railroads in North Dakota, therefore, were greatly benefited since their personal property amounted to about 50% of their property within the state. (footnotes omitted).

■ It is obvious from the legislative history of § 306 that Congress did not intend to "abrogate the right of a State to establish separate rates for the different traditional classes of property." However, as noted previously by this court, the State of Kansas does not classify railroad property into the "traditional classes" of property. This causes certain problems in attempting to make a comparison of assessment ratios of real and personal property. The court is now confident in its belief that the assessment ratio of the personal property of the railroads, as it is presently classified, should not be compared to the assessment ratio of the personal property of commercial and industrial companies in Kansas. Unless it is adequately demonstrated that the property of the railroads can be separated into the traditional classes of property, then the court will not attempt to make such a breakdown. Rather, the court will simply compare the assessment ratio of rail transportation property with the assessment ratio of commercial and industrial property, both real and personal. The court will follow this procedure on the instant motions and in the future unless the parties provide some reason to proceed otherwise.

Finally, the defendants have raised the issue of whether the county officials are necessary or indispensable parties to this action. A reading of plaintiffs' complaint makes it clear that they believe the county defendants are only required to be in this lawsuit because of their claims for a refund of their 1979 taxes. Plaintiffs have repeatedly maintained that it is not necessary to join the county defendants in their cause of action to enjoin the assessment and collection of certain of their 1980 taxes. This court agreed with the position of the plaintiffs in its order of December 3, 1980. Furthermore, the Tenth Circuit agreed in its order of January 23, 1981, wherein it stated:

Defendants maintain that the Secretary of Revenue of the State of Kansas, the Director of Property Valuation of the Department of Revenue of the State of Kansas, and the Department of Revenue of the State of Kansas are not the proper party defendants to this action, since these defendants have no authority under Kansas law to collect the Railroads' ad valorem taxes. Defendants maintain that the County Treasurers collect such taxes, and that the County Treasurers are not agents of these defendants or in "active concert or participation" with these defendants within the meaning of Rule 65(d), Fed.R.Civ.P. Defendants' argument misses the point, however.

49 U.S.C. § 11503(b) makes it a violation of the Interstate Commerce Act to assess rail transportation property at higher values than other commercial and industrial property, and/or to levy or collect taxes on rail transportation property which are based in improper assessments. The major issue involved in a § 11503(b) charge, therefore, concerns the assessment of the Railroads' transportation property, since the taxes levied and collected will be based on that assessment. The named defendants are responsible for assessing the plaintiffs' property, and as such are the proper parties before the court.

640 F.2d at 261.

Defendants argue that the Tenth Circuit did not fully have this issue before it and, therefore, the opinion should be accorded little weight. We must disagree. Even if the Tenth Circuit did not fully examine the issue, we believe they decided it correctly.

The rule relating to joinder of persons needed for just adjudication is a rule of procedure and, therefore, federal law is applicable in determining which parties are, in fact, indispensable. *Provident Tradesmens Bank v. Patterson*, 390 U.S. 102, 125 n. 22, 88 S.Ct. 733, 746 n. 22, 19 L.Ed.2d 936 (1968); *Wright v. Albuquerque Auto-Truck Stop Plaza, Inc.*, 591 F.2d 585, 586–587 (10th Cir. 1979). The federal rule for joinder is set out in F.R.Civ.P. 19, which provides in pertinent part:

> (a) PERSONS TO BE JOINED IF FEASIBLE. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

In the instant case, the state defendants are the only parties required to provide "complete relief" on the plaintiffs' claims of discrimination. The State defendants are charged with making the assessments alleged to be illegal under 49 U.S.C. § 11503. The counties have nothing to do with developing the assessment that the plaintiffs contend violates § 11503. Where assessment of state assessed property is the issue, complete relief may be afforded without the addition of the county officials. Of course, the counties and the various officials of each county have an interest in the subject matter of this lawsuit. However, the fact that the county officials are not parties to the lawsuit on plaintiffs' claims for relief on their 1980 taxes does not impair or impede their ability to protect their interest. The counties' interest in this lawsuit is merely the fact that it may affect their revenues. They have no legal interest in the resolution of the issues in this action. The plaintiffs have not challenged the way local property is assessed or the manner in which the counties levy and collect taxes. The illegal assessment was made at the state level and those defendants are properly in this action. Therefore, the court finds that the county defendants need not be made parties to this lawsuit on plaintiffs' claims for 1980 taxes.

Having discussed the various issues which have emerged in this action, the court moves on to a decision of the motions presently pending before this court.

MOTION TO AMEND

At the hearing on the instant motions, the court orally granted plaintiffs' motion to amend their complaints. Plaintiffs sought to amend their complaints in this action to proceed upon only one complaint and to delete the study of Dr. Pine that was attached to each of the original complaints filed by the Topeka railroads. Under F.R.Civ.P. 15(a), leave to amend pleadings is to be "freely given when justice so requires." The court believes that this amendment will allow the case to proceed in a more orderly and efficient fashion. Furthermore, the allowance of this amendment will not prejudice the defendants in any substantial degree. Therefore, plaintiffs' motion to amend is hereby granted.

MOTION FOR PRELIMINARY INJUNCTION

The Tenth Circuit has indicated to this court that the test for issuing an injunction in this action is whether there is "reasonable cause" to believe that a violation of Section 306 has occurred or is about to occur. *Atchison, Topeka and Santa Fe Railway Co. v. Lennen, supra,* at 261. On June 12, 1981, and June 15, 1981, this court heard evidence on plaintiffs' motion for a preliminary injunction to enjoin the defendants from collecting property taxes in excess of what the railroads believe they owe

for the second half of their 1980 taxes.[10] After a careful review of the evidence presented at the hearing, the court finds that plaintiffs have produced sufficient evidence to show that there is "reasonable cause" to believe that a violation of 49 U.S.C. § 11503 has occurred. Therefore, the court shall grant plaintiffs' motion for a preliminary injunction.

However, an issue remains as to the extent of the amount of property taxes that the plaintiffs will be allowed to withhold. Dr. Frederick Ekeblad, a consultant in the area of statistics and economics, testified at the instant hearing on behalf of the plaintiffs. He presented evidence on the results of sales assessment ratio studies he conducted for the plaintiffs. His studies showed that commercial and industrial real property in Kansas in 1980 was assessed at 12.1% of fair market value. In addition, his studies showed that all real property in Kansas in 1980 was assessed at 7.4% of fair market value. Dr. Ekeblad did not conduct any study on the appropriate assessment ratio of personal property in Kansas. However, he did testify, based upon his review of census statistics, that commercial and industrial personal property was probably not assessed at any higher ratio than that of real property.[11]

In opposition to plaintiffs' motion, defendants presented the testimony of Philip Martin, Director of Property Valuation. Martin testified that all personal property in Kansas was assessed at 30% of fair market value. He further stated that all state assessed utility property, including railroads, was assessed at 30% of fair market value. He admitted that real property in Kansas was assessed at less than 30%.

After careful consideration of the evidence, the court is somewhat concerned about what the proper assessment ratio of commercial and industrial personal property is in Kansas. Dr. Ekeblad admitted that an "appraisal" ratio study for personal property could conceivably be developed but that none had been conducted in this case due to the high cost of such a study. In addition, it was his belief that such a study would be very unreliable and subject to considerable variation. Michael Goodwin, Chief of the Public Service Company Bureau of the Division of Property Valuation, testified that he believed that a personal property ratio study could be conducted but that he had never seen one. The evidence presented by the plaintiffs did raise some question in the court's mind as to whether commercial and industrial personal property is assessed at 30% of fair market value in the State of Kansas. However, an appropriate ratio for this type of property was not determined to the satisfaction of the court. Therefore, the court will consider the evidence presented on the assessment ratio of "all other property" in Kansas.

After a review of the testimony and exhibits presented on the assessment ratio of all other property in Kansas, the court finds

---

**10.** Actually, plaintiffs sought to have the previous injunctions continued based upon the past findings of this court. The court declined to issue an injunction based upon the past evidence for several reasons. First, the county defendants strenuously objected to the continuance of an injunction which was entered at a time in these proceedings when the county officials were not parties. The court recognized the current emphasis on due process rights and found that perhaps they should be allowed some input at this time. Secondly, and more importantly, the court believed that evidence was required in order to allow the court to make appropriate findings of fact. In this court's previous order denying the Topeka railroads' motion for preliminary injunction, this court made very limited findings of fact. The need for proper findings of facts is particularly important in determining the extent to which the railroads would be allowed to withhold taxes if "reasonable cause" is found to believe that a violation of § 11503 has occurred. Furthermore, the injunction in the Topeka railroads' cases had been based upon assessment ratios as determined by Dr. Pine's study. Since the court has orally allowed the plaintiffs to amend their complaints to delete the Pine study, the court finds that additional evidence on plaintiffs' motion is necessary.

**11.** The plaintiffs also introduced an affidavit of Rolf A. Weil, economist and President of Roosevelt University, wherein he stated, "it is inconceivable ... that personal property is assessed at the statutory level" in Kansas. This statement was based upon his past observations rather than on a study of personal property in Kansas.

that the ratio adduced in plaintiffs' exhibit # 8 establishes the appropriate ratio at this point in the proceedings. Once again, the court is not certain that personal·property in Kansas is assessed at 30% but believes the evidence presented by the defendants was stronger on this point than that presented by the plaintiffs. The court has also included state assessed utility property (excluding railroads) within its consideration of all other property. The figures as established by the plaintiffs are as follows:

|  | Fair Market Value | Assessed Value | Ratio |
|---|---|---|---|
| STATE ASSESSED UTILITY PROPERTY (excluding railroads) | 4,914,036,000 | 1,474,211,000 | 30% |
| PERSONAL PROPERTY | 12,044,363,000 | 3,613,309,000 | 30% |
| REAL PROPERTY | 66,183,945,000 | 4,897,612,000 | 7.4% |
|  | 83,142,344,000 | 9,985,132,000 | 12% |

■ Since the plaintiffs have sufficiently demonstrated that all other property in Kansas is assessed at 12% of fair market value, or 40% of the amount that rail transportation property is assessed, then the court shall enjoin the defendants and their agents from collecting 60% of the ·second half of plaintiffs' 1980 property taxes. The plaintiffs shall deposit this amount with the Clerk of the Court pending further order of this court. The Clerk is directed to invest the deposited funds in government bonds at the prevailing rate of interest. This preliminary injunction shall be effective until further order of this court.

## MOTION TO DISMISS

Defendants have moved to dismiss plaintiffs' second and third causes of action for relief for failure to state a claim under either section 306 of the 4–R Act, or the Civil Rights Act, 42 U.S.C. § 1983. We agree with the defendants that plaintiffs cannot be granted retrospective relief under either section 306 or § 1983. The taxes paid without protest to the counties by plaintiffs in 1979 cannot now be refunded.

I. Section 306 of the 4–R Act expressly and impliedly grants prospective relief only.

■ Whether retrospective relief is provided by section 306 of the 4–R Act is an issue that has not previously been decided. Cases which have granted relief under the Act for the 1979 tax year were all cases in which the plaintiff railroads filed complaints in or before 1979 and requested injunctive or declarative relief before the taxes had been paid. *See Ogilvie v. North Dakota, supra; Alabama Great Southern Railroad Company v. Eagerton*, 472 F.Supp. 60, (N.D.Ala.1979); *Tennessee v. Louisville and Nashville Railroad Co.*, 478 F.Supp. 199 (M.D.Tenn.1979).

Reliance by the plaintiffs on *Alabama Great Southern Railroad* to validate their claims for 1979 tax refunds is misplaced. That case was decided in 1979 and required the state to reduce its assessment for that year. The railroads admit here, however, that they did not bring suit until after their taxes had been paid without protest. The *Alabama Great Southern Railroad* case granted relief for a current violation, not for past violations. Hence, it is not helpful to the decision of the issues at hand.

Before this court could find that a cause of action for retrospective relief is sufficiently stated, we would have to find either an express or implied grant of jurisdiction by Congress to the federal courts to provide such relief. We find no such grant in either the language or purpose of the 4–R Act.

A. The language of the 4–R Act, construed in accordance with its ordinary meaning does not provide for tax refunds.

The United States Supreme Court in *Rosewell v. LaSalle National Bank*, 450 U.S. 503, 512, 101 S.Ct. 1221, 1228, 67 L.Ed.2d 464 (1981), reaffirmed the well-established rule that "the starting point of our inquiry is the plain language of the statute itself." Section 306 of the 4–R Act states that:

(2) ... the district courts of the United States shall have jurisdiction, without regard to amount in controversy or citizenship of the parties, to grant such mandatory or prohibitive *injunctive relief*, interim equitable relief and *declaratory judg-*

*ments* as may be *necessary to prevent, restrain or terminate any acts in violation of this section. . . .* (emphasis added) [12] The relief granted is limited to that which is "necessary to prevent" acts violating the section. Acts which violate the section are discriminatory "assessments" and "collections." The use of the words "prevent, restrain or terminate" is indicative of Congressional intent to provide preventative relief, that is to stop what is presently occurring or to prevent a recurrence of past discrimination. No mention is made in the legislative history of an intent to provide relief from past illegal assessments and collections.

Plaintiffs contend that § 306 should be construed as a grant of equity power broad enough to allow the courts to grant restitution. They rely upon several cases which have implied remedies beyond those specifically granted, including restitution, when necessary to afford "whatever relief may be necessary under the circumstances." *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 1089, 90 L.Ed. 1332 (1946); *Mitchell v. DeMario Jewelry, Inc.*, 361 U.S. 288, 291, 80 S.Ct. 332, 334, 4 L.Ed.2d 323 (1960). In these cases it was enough to give the court jurisdiction that there was no statutory language restricting the court's equity power.

The cases cited by plaintiffs include cases where the court was asked to imply a private right of action where none had been specifically granted. *See, e.g., Mills v. Electric Auto-Lite*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1971); *J.I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39–40, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916). In *Mills*, the United States Supreme Court concluded that Congress had left it with the discretion to decide whether a remedy should be implied, and implied one as being necessary where only an action by the Securities and Exchange Commission was expressly provided and the Court felt that that was inadequate to accomplish the public purposes of the statute involved. The Court was careful to distinguish the situation in *Fleischmann Corp. v. Maier Brewing Co.*, 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967) where an adequate remedy was provided in the statute:

> *Since Congress* in the Lanham Act had 'meticulously *detailed the remedies available* to a plaintiff who proves that his valid trademark has been infringed,' the Court in *Fleischmann* concluded that the *express remedial provisions were intended 'to mark the boundaries of the power to award monetary relief in cases arising under the Act.'* 386 U.S. at 719, 721 [87 S.Ct. at 1408]. By contrast, we cannot fairly infer from the Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies. *Cf. Bakery Workers Union v. Ratner*, 118 U.S.App.D.C. 269, 274–275, 355 F.2d 691, 696–697 (1964). The Act makes no provision for private recovery for a violation of section 14(a), other than the declaration of 'voidness' in section 29(b), leaving the courts with the task, faced by this Court in *Borak*, of deciding whether a private right of action should be implied. (emphasis added).

396 U.S. at 391, 90 S.Ct. at 625.

In enacting the 4–R Act, as it did with the Lanham Act, Congress carefully provided specific remedies. Had Congress wished to leave open the possibility of other remedies it could have done so with the broad language it has used in other statutes. [13] Although there is no statutory language restricting the court's equitable power, the statutory purpose and the appropriate and

---

12. The Historical and Revision notes to 49 U.S.C. § 11503(c) state that "the words 'such mandatory or prohibitive' and 'interim equitable relief' are omitted as unnecessary. . . . The word 'prevent' is substituted for 'prevent, restrain or terminate' to eliminate redundancy. . . ."

13. § 205(a) of the Emergency Price Control Act of 1942, 50 U.S.C.App. § 925(a), provided the equity courts with jurisdiction "to issue whatever 'other order' may be necessary to vindicate the public interest", *Porter v. Warner Holding Co., supra*, 328 U.S. at 395, 66 S.Ct. at 1086, 90 L.Ed. at 1332.

necessary relief for carrying out that purpose are much different here than in the cases cited by plaintiff. It is important to note that in those cases where a remedy was implied from the language and purpose of a statute it was necessary and appropriate to do so to carry out a statutory purpose of protecting the public interest.[14]

B. The legislative purpose in enacting the 4–R Act does not indicate that retrospective relief was meant to be given for a violation of the Act.

The purpose of section 306 of the 4–R Act is to "eliminate the longstanding burden on interstate commerce resulting from discriminatory state and local taxation of common carrier transportation property.... Procedurally, it would provide a remedy in the Federal courts for common and contract carriers against the *collection* of the excessive portion of any tax based upon such unlawful assessment of rate." (emphasis added). S.Rep.No.91–630, 91st Cong., 1st Sess. (1969).

S.Rep.91–630 further states that:

Paragraph (2)[15] provides that the district court shall have jurisdiction, upon complaint and after hearing, to issue such writs of injunction or other proper process, mandatory or otherwise, as may be necessary *to restrain* any State, or subdivision *from doing* anything or performing any act declared unlawful under paragraph (1).

The purpose of paragraph (2) is to allow an aggrieved carrier to bring suit in a Federal district court to challenge the excessive portion of a State or local transportation property tax. The committee intends that the carrier challenging the State tax shall have the burden of proof. If the carrier sustains the burden of proving that a State or local taxing agency is assessing, collecting, or imposing tax rates that are discriminatory, the Federal district courts are authorized to *enjoin* the unlawful action.

The report concluded:

The committee wishes to emphasize that this bill would in no way alter the freedom of a State to tax its taxpayers so long as interstate carriers are accorded equal tax treatment with other taxpayers. In the majority of States that now grant equal justice to all taxpayers, State property tax assessments, collections or rates would in no way be affected by passage of this bill. In the remaining States, 3 years would be provided for adjustment, and thereafter, *no change would be required unless and until an affected carrier has proved his case in court* that State discriminatory tax practices exist. *Absent such proof* in a court of law, *this statute would have no effect whatsoever on any act of any State regarding any tax at any time.* (emphasis added).

The legislative purpose, as enunciated in this report, in enacting section 306 of the 4–R Act was to provide temporary relief upon commencement of a suit and more permanent relief once the violations are proved. Retrospective relief apparently was not contemplated. This conclusion is

---

14. *See United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 228–29 (9th Cir. 1978), *cert. den.*, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978), where the 9th Circuit implied a remedy under the Clayton Act (15 U.S.C. §§ 18, 25) of recission of an acquisition offensive to the Clayton Act where no such remedy was specifically provided. The Court stated:

"... the Supreme Court repeatedly has recognized the power of the equity court to mold the necessary decrees to give effect to congressional policy.... In such cases '(c)ourts of equity may, and frequently do, go much farther both to give and *withhold relief in furtherance of the public interest* than they

are accustomed to go when only private interests are involved.' *United States v. First Nat. City Bank, supra*, 379 U.S. at 383, 85 S.Ct. at 531, citing with approval *Virginian Railroad Co. v. System Federation No. 40*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937).... Indeed, the necessity of broad equity powers to enforce the *antitrust* laws has often been declared." (emphasis added).

*See also Commodity Futures Trading Com'n. v. Hunt*, 591 F.2d 1211 (7th Cir. 1979).

15. Para. 2 of S. 2289, Report of Committee on Commerce, 91–630. 1st Sess., Dec. 20, 1969.

supported by the following scenario which occurred and was recorded during Hearings before the Committee on Interstate and Foreign Commerce in the House of Representatives:

> Mr. Watson. [Representative from South Carolina] Further, it is your interpretation of this legislation that the contest would arise at the point of assessment rather than at the point of levy, that you can go into Federal court at the time of assessment rather than waiting for the district to actually levy the taxes against the carriers?
>
> Mr. Ogden. [Vice President and General Counsel of the Gulf, Mobile & Ohio Railroad Co., representing the Association of America Railroads] Yes, sir.

It is clear that the Congressional purpose in enacting § 306 was to end discrimination by the States by providing the railroads with access to the Federal courts. It is necessary for plaintiffs to take some action invoking that jurisdiction before a remedy can be provided.

The cases which plaintiffs cite as precedent for the implication of a retrospective remedy involved injured parties who could not have known of the violations until the harm had already occurred, or if they did know, could not have prevented the violations or harm from occurring without severe hardship. These cases also involved a much more direct purpose to protect the public interest and, therefore, the courts invoked remedies within their equitable powers which were necessary and appropriate to right the particular wrong.[16]

Although plaintiffs are not required to exhaust all state administrative remedies, their failure to comply at all with reasonable state procedures (*infra* pp. 242–243) severely damages their plea for equity. We conclude that since the harm sought to be prevented is a discriminatory assessment or collection, a harm which plaintiffs had ample opportunity to mitigate, it would be neither necessary, nor appropriate to pro-

vide an implied cause of action for retrospective damages where Congress has not seen fit to do so expressly.

> C. Balancing the equities in this case, we are unable to conclude that the implication of a remedy would be proper.

The United States Supreme Court in *Mills, supra,* recognized the importance of balancing the public interest when implying a remedy when it said:

> We held in *Borak* that upon finding a violation the courts were 'to be alert to provide such remedies as are necessary to make effective the congressional purpose,' noting specifically that such remedies are not to be limited to prospective relief. 377 U.S., at 433, 434 [84 S.Ct., at 1560, 1561]. In devising retrospective relief for violation of the proxy rules, the federal courts should consider the same factors that would govern the relief granted for any *similar illegality or fraud.*
>
> ... In selecting a remedy the lower courts should exercise 'the sound discretion which guides the determinations of courts of equity,' keeping in mind the role of equity as 'the instrument for nice adjustment and reconciliation between the *public interest* and private needs as well as between competing private claims.' *Hecht Co. v. Bowles,* 321 U.S. 321, 329–330 [64 S.Ct. 587, 591–592, 88 L.Ed. 754] (1944), quoting from *Meredith v. Winter Haven,* 320 U.S. 228, 235 [64 S.Ct. 7, 11, 88 L.Ed. 9] (1943). (emphasis added). 396 U.S. at 386, 90 S.Ct. at 622.

The Tenth Circuit held in granting plaintiffs' appeal for injunctive relief and reversing our order of December 3, 1980, that "when the trial court weighed the damage to be suffered by the Railroads against the damage to be suffered by the State treasury, it did not exercise its discretion to grant or deny the injunction in light of the purposes of the Interstate Commerce Act."

---

16. *See* note 14, *supra, see also Mills, supra,* 396 U.S. at 377, 90 S.Ct. at 618, citing *Borak, supra,*

377 U.S. at 432, 84 S.Ct. at 1559.

*Atchison, Topeka and Santa Fe Railway Co. v. Lennen, supra* at 259. However, the cases implying remedies broader than those specifically provided require the court to balance the equities when determining the propriety of implying such broad relief. Weighing the equities here, we are unable to conclude that this court should hold that Congress intended the courts to imply a remedy under § 306 of the 4–R Act and our broad equity power.

Plaintiffs failed to protest or to bring suit notifying the defendants that the amount of taxes was disputed before defendants had exercised rightful dominion over the taxes and spent the money for appropriate state and county functions. Plaintiffs assert no equitable reasons for their failure to comply with state procedures. The balance here weighs heavily against implying retroactive relief. The public interest requires that money which was rightfully spent not be recovered from future taxes. This is particularly true in light of the railroads' failure to notify the state by suit or protest of their intentions to recover a part of their taxes.

D.  Extending the scope of Section 306 of the 4–R Act to include the retrospective relief requested by plaintiffs would interfere impermissibly with integral state functions.

In *Arizona v. Atchison, Topeka, and Santa Fe*, No. Civ. 78–655 (D.Ariz., unpublished, 1/29/79), the court concluded that the controversy was ripe for adjudication because "the contingencies that Arizona will not collect the property tax as it now exists or that the defendant railroads will not protest the collection of such taxes based on Section 306 seem also quite improbable. . . ." The court decided that in light of stipulated facts as to violations occurring and the unlikelihood of these contingencies operating, the declaratory judgment action ws appropriate. If the contingencies had occurred, that is if plaintiffs there had failed to protest and the taxes had been collected, the suit, by implication, would have been inappropriate. We believe that the 1979 claim is barred here for the same, as well as many other reasons.

The State of Arizona also argued that the 4–R Act was unconstitutional because it infringes upon the states' taxing power in violation of the Tenth Amendment, citing *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The Supreme Court in *Usery* held unconstitutional as a violation of the Tenth Amendment an amendment to the Fair Labor Standards Act requiring the states to pay most state and municipal employees according to the minimum wage and hour provisions of the Act. A plurality of the Court stated:

> We hold insofar as the challenged amendments operate to directly displace the states' freedom to structure integral operations in areas of traditional governmental functions, they are not within the authority granted to Congress by Art. I, section 8, cl. 3. 426 U.S. at 852, 96 S.Ct. at 2474.

The District Court of Arizona upheld the constitutionality of § 306, but explained:

> *Restricting how a state collects taxes, moreover, does not as directly or substantially affect the policy choices a state makes as does restricting how collected taxes are to be spent,* which was involved in *National League of Cities.* Thus it is concluded that Section 306 does not force directly upon the states Congressional choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. *Arizona, supra,* at 17 (emphasis added).

Implying the statute to provide retroactive relief would substantially interfere with the choices the state makes regarding how collected taxes are to be spent. The states would be caught in the throes of a dilemma, with their ability to make effective policy choices dependent upon the whims of the railroads. The states would be required to choose between 1) assuming that the railroads would follow procedures required of all other taxpayers disputing their tax bills and proceeding in their normal manner of budgeting and spending col-

lected taxes, all the while risking that the railroads might at any time decide to bring a suit, or 2) holding the collected funds until some undetermined time when the statute of limitations had run, recognizing that at least some of the money was due the counties, but not knowing how much, if any, to hold in anticipation of a suit.

A single group of taxpayers interference with and domination over the defendants' power to spend taxes paid to them without protest, which power is vital to their ability to structure and finance their integral governmental functions, could not have been intended by Congress and cannot be allowed under the Tenth Amendment. As the plurality said in *Usery* and as would be equally applicable here if a remedy for back taxes were implied:

> If Congress may withdraw from the States the authority to make those fundamental [employment] decisions upon which their systems for performance of these functions must rest, we think *there would be little left of the States' " 'separate and independant existence.' "* *Coyle,* 221 U.S. at 580 [31 S.Ct. at 695]. . . . the dispositive factor is that Congress has attempted to exercise its Commerce Clause authority to prescribe minimum wages and maximum hours to be paid by the States in their capacities as sovereign governments. In so doing, Congress has sought to wield its power in a fashion that would impair the States' "ability to function effectively in a federal system," *Fry,* 421 U.S. at 547 n.7, 95 S.Ct. at 1795 n.7. (emphasis added).
>
> 426 U.S. 851–852, 96 S.Ct. 2474.

Recognizing the "broad power of Congress to regulate interstate commerce and those activities affecting commerce," *Fry v. United States,* 421 U.S. 542, 547, 95 S.Ct. 1792, 1795, 44 L.Ed.2d 363 (1975), we hold that a refund of 1979 taxes, as an additional remedy under the 4–R Act, would be unnecessary, inappropriate, inequitable and unconstitutional. The relief requested would interfere impermissibly with the states' ability to structure integral governmental operations. Plaintiffs, therefore, have failed to allege facts sufficient to state a cause of action for recovery of their 1979 taxes under § 306.

II. Plaintiffs fail to allege facts sufficient to state a cause of action under 42 U.S.C. 1983, The Civil Rights Act.

A. 28 U.S.C. 1341 bars the plaintiffs' claims for refunds of 1979 taxes under 42 U.S.C. 1983.

The Supreme Court in *Rosewell, supra,* held that if a state refund procedure is "a plain, speedy, and efficient remedy" within the meaning of the Tax Injunction Act (§ 1341), then federal jurisdiction to grant injunctive relief in a 1983 action is barred. The Tax Injunction Act bars suits for refunds as well as anticipatory relief. *Kelly v. Springett,* 527 F.2d 1090 (9th Cir. 1975); *Bland v. McHann,* 463 F.2d 21 (5th Cir. 1972), *cert. den.,* 410 U.S. 966, 93 S.Ct. 1438, 35 L.Ed.2d 700 (1973); *Fair Assessment in Real Estate Association v. McNary,* 478 F.Supp. 1231 (E.D.Mo.1979).

Plaintiffs claim that § 1341 does not apply to their claims for restitution because the federal court has jurisdiction under § 306 which specifically suspends § 1341. § 306 suspends § 1341 only when a remedy provided by § 306 is sought. Since there is no remedy available to plaintiffs under § 306 for their 1979 tax claims, that section has no bearing on the § 1983 claims.

Plaintiffs also assert that *Fulton Market Cold Storage v. Cullerton,* 582 F.2d 1071 (7th Cir. 1978), *cert. den.* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), held that § 1341 bars only injunctive relief and not damages. However, the reason that § 1341 bars injunctive relief is the disruptive effect of injunctions on state tax procedures. Nothing could be more disruptive of state tax procedures than the relief that plaintiffs request. To the extent that *Fulton Market* is not overruled by *Rosewell,* it is certainly inapplicable to the present situation. It would be logically inconsistent to hold here that § 1341 bars a suit for injunctive relief, but not one for damages.

B. Kansas remedies for refunds of back taxes are plain, speedy, and efficient, so § 1341 is not abrogated.

*Rosewell, supra*, held that "[o]n its face the 'plain, speedy and efficient remedy' exception appears to require a state court remedy that meets certain minimal *procedural* criteria," and the Tax Injunction Act's legislative history supports this procedural interpretation. The court further held that "because [the] remedy imposes no unusual hardship on respondent requiring ineffectual activity of an unnecessary expenditure of time or energy we cannot say that it is not 'efficient.'" 450 U.S. at 512–518, 101 S.Ct. at 1228–1231. Plaintiffs assert that the Kansas remedy is not plain, speedy or efficient because it is unduly burdensome in that it requires the railroads to protest in every county. They also assert that they are not required to comply with the same protest procedures which other taxpayers must follow. Although plaintiffs may not be required to exhaust all the state administrative remedies when a suit is brought under the 4–R Act, *Rosewell* makes it clear that state procedures must be complied with in a § 1983 action.

This court held in its order of December 3, 1980, and has previously held that the tax refund and protest procedures of Kansas, K.S.A. 79–2005, are plain, speedy, and efficient. See *Natural Gas Pipeline Co. of America, v. Sergeant*, 337 F.Supp. 88 (D.Kan.1972); *Northern Natural Gas Co. v. Wilson*, 340 F.Supp. 1126 (D.Kan.1971). The procedure is not "unduly burdensome" because it requires no "ineffectual activity or unnecessary expenditures of time or energy" since the railroads must pay taxes individually to the counties anyway. The protest procedure is a device by which the counties and state fairly can be notified that even though no suit has been brought

and no appeal taken, the taxes being paid are disputed. The state can then take precautions to protect itself financially in case liability is proved. The affidavit of Robert L. Kennedy, Jr., Secretary and Chief Attorney for the Kansas State Board of Tax Appeals, supplies further proof that the Kansas procedures are efficient.[17]

Furthermore, it is well-established that federal courts should avoid exercising equity jurisdiction in the traditional state area of taxation. In *Matthews v. Rodgers*, 284 U.S. 521, 525–26, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1931), the Supreme Court stated:

> Section 16 of the Judiciary Act of 1789. 1 Stat. 82, perpetuated without material change as Rev.Stat. 723, 28 U.S.C. § 384, Jud.Code § 267, declares that suits in equity shall not be sustained in the courts of the United States "in any case where plain, adequate and complete remedy may be had at law. . . ." The reason for this guiding principle is of peculiar force in cases where the suit, like the present one, is brought to enjoin the collection of a state tax in courts of a different, though paramount sovereignty. The scrupulous regard for the rightful independence of state governments which should at all times actuate the federal courts, and a proper reluctance to interfere by injunction with their fiscal operations, require that such relief should be denied in every case where the asserted federal right may be preserved without it. Whenever the question has been presented, this Court has uniformly held that the mere illegality or unconstitutionality of a state or municipal tax is not in itself a ground for equitable relief in the courts of the United States.

The Supreme Court in *Great Lakes Co. v. Huffman*, 319 U.S. 293, 298, 300–01, 63 S.Ct. 1070, 1074, 87 L.Ed. 1407 (1943), held that:

> taxes became due would not have to protest their taxes in order to insure any refund which may be due them. . . . Mass filings of protests or other appeals to the Board, which involve questions of state-wide impact or major tax revenue consequences to local tax districts are generally consolidated by the Board and expedited for hearing."

17. Affidavit supplied by the State of Kansas in opposition to motion for reconsideration filed on December 8, 1980:

"I testified that the purpose of this amendment (K.S.A. 79–2005) was to make clear that a state-assessed property owner who had an appeal pending before the Board of Tax Appeals at the time their ad valorem

It is in the public interest that federal courts of equity should exercise their discretionary power to grant or withhold relief so as to avoid needless obstruction of the domestic policy of the states.... It is the court's duty to withhold such relief when, as in the present case, it appears that the state legislature has provided that on payment of any challenged tax to the appropriate state officer, the taxpayer may maintain a suit to recover it back. 319 U.S. at 298, 300–301, 63 S.Ct. at 1074.

These cases reiterate that on those occasions when it is proper for the federal courts to grant relief although state procedures have not been complied with, the public interest should be benefitted, or at least not harmed. Allowing § 1341 to be disregarded on a § 1983 claim for back taxes would emasculate the long-accepted Tax Injunction Act. We hold that § 1341 bars the railroads' claims for back taxes in Kansas because the state remedy is plain, speedy and efficient and the Congressional purpose in enacting § 1341 is furthered by our holding.

    C.  Assuming arguendo that plaintiffs' claims were not barred by § 1341, plaintiff still fails to state a cause of action under § 1983.

■■■ No constitutional rights of plaintiffs have been alleged to have been violated and no facts have been or could be alleged which are sufficient to constitute a violation of a constitutional right. Plaintiffs claim that § 1341 does not bar the § 1983 claim, but fails to state which constitutional right is alleged to be violated. In *Fulton Market,* a case heavily relied upon by plaintiffs, the court noted that the outcome of the suit depended upon whether the defendants' conduct violated Constitutional standards. It has been held repeatedly and is firmly established that the Equal Protection Clause of the Fourteenth Amendment is not violated by classifying property and taxing it at different rates. *Nashville Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362 at 368, 60 S.Ct. 968, at 971, 84 L.Ed. 1254 (1940), *Ogilvie v.*

*North Dakota, supra,* at 450 n. 2. It is only when the members of a class are treated differently from each other that a violation of the Constitution has occurred under that clause. *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1972); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); *Atlantic & Pacific Tea Co. v. Grosjean,* 301 U.S. 412, 57 S.Ct. 772, 81 L.Ed. 1193 (1937); *Nashville, Chattanooga & St. Louis Railway, supra,* 310 U.S. at 368, 60 S.Ct. at 971. It is not alleged that the railroads are being treated differently among themselves or even among other public utility corporations. In fact, the preliminary evidence shows that the railroads and public utility corporations are all being taxed and assessed at about the same rates.

When suing directly under § 1983 for monetary, declaratory or injunctive relief "... the touchstone of the 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution," *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). In *Fulton Market, supra,* it was also emphasized that the action requires allegations of the necessary personal involvement of the government agent, that *respondeat superior* will not apply, and that defendants have a good faith defense to the action. Plaintiffs fail to allege that the necessary personal involvement and intentional action of a state official is operating here.

■■■ The Equal Protection Clause of the Fourteenth Amendment is not necessarily violated by the violation of a statute unless that statute confers upon plaintiffs a constitutional right. Since numerous cases have held that taxpayers do not have a constitutional right to be treated equally, except as members of a class must be treated equally among a reasonable classification, section 306 of the 4–R Act only created an exception to the rule that states may discriminate in their classifications and rate structures for different types of property

for tax purposes. Since § 306 is an exception to the rule, a remedy for an alleged violation of the statute is limited to that remedy expressly or impliedly provided.

■ We find that § 306 was not meant to cover tax refunds because they are not necessary to prevent a discriminatory assessment or collection. The remedy provided by § 306 is certainly adequate to restrain the State, as we have seen from the Tenth Circuit's opinion that obtaining an injunction under the Act requires only a showing of reasonable cause.

Obtaining additional relief which is not specifically provided for in the statute requires a greater showing of equitable circumstances. Reading the facts in the light most favorable to the railroads, we find that they cannot and have not made a showing of equitable circumstances which outweighs that of the state and counties of Kansas. Therefore, plaintiffs have failed to state a cause of action for a refund of 1979 taxes under section 306 of the 4–R Act.

■ We also hold that plaintiffs have failed to allege facts sufficient to state a cause of action under § 1983. The action is barred by § 1341, the Tax Injunction Act, under *Rosewell.* Furthermore, no constitutional right has been violated and no facts are alleged indicating who might be personally responsible for intentionally violating any constitutional rights of the plaintiffs.

Based upon the foregoing discussion, this court hereby grants defendants' motion to dismiss counts two and three of plaintiffs' complaint. This ruling also dismisses the county defendants in this lawsuit because these are the only counts in which they have been named as parties. Furthermore, as previously discussed in this memorandum, the court has held that the county defendants are not necessary parties to this action on plaintiffs' claims for relief on their 1980 taxes. However, the court will entertain motions to intervene by the county defendants at this time. In the interest of judicial expediency, the court will give the county defendants twenty days to file motions to intervene if they desire to file

such a motion. The court will in the near future issue an order discussing the motions that have been filed up to this point by the county defendants.